IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CHARLENE GERMANY<br>*on behalf of* K.G.,<br><br>    Plaintiff,<br><br>v.<br><br>COMMISSIONER OF<br>SOCIAL SECURITY,<br><br>    Defendant. | Case No. 5:18-CV-283<br><br>JUDGE BENITA Y. PEARSON<br><br>MAGISTRATE JUDGE<br>THOMAS M. PARKER<br><br>**REPORT & RECOMMENDATION** |

## I.  Introduction

Plaintiff, Charlene Germany, seeks judicial review of the final decision of the Commissioner of Social Security denying her application for supplemental security income benefits on behalf of her minor child, K.G., under Title XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the ALJ applied proper legal procedures and reached a decision supported by substantial evidence, I recommend that the final decision of the Commissioner be AFFIRMED.

## II.  Procedural History

On July 17, 2014, Germany, on behalf of her minor child, K.G., applied for supplemental security income.  (Tr. 187).  Germany alleged that K.G. became disabled on July 17, 2009, due to cryptogenic organizing pneumonia ("COP"), chronic asthma, a learning disability, lack of oxygen to brain at birth, severe lead poisoning, developmental delay, short attention span, speech delay, and severe allergies.  (Tr. 187, 209).  The Social Security Administration denied

Germany's application initially and upon reconsideration. (Tr. 73–95). Germany requested an administrative hearing. (Tr. 111). Administrative Law Judge ("ALJ") Joseph Vallowe heard the case on January 11, 2017, and issued a written decision denying Germany's claim on April 11, 2017. (Tr. 15–30, 36). On December 7, 2017, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1–5, 184–85). On February 5, 2018, Germany filed a complaint seeking judicial review of the Commissioner's decision. ECF Doc. 1.

### III. Standard for Child Disability Claims

The standard for evaluating a child disability claim differs from that used for an adult's claim. 42 U.S.C. § 1382c(a)(3)(C); *see also Miller ex rel. Devine v. Comm'r of Soc. Sec.*, 37 F. App'x 146, 147 (6th Cir. 2002). A child is considered disabled if he has a "medically determinable physical or mental impairment that results in marked and severe functional limitations and can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process. 20 C.F.R. § 416.924(a). At Step One, a child must not have engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At Step Two, a child must be found to suffer from a "severe impairment." 20 C.F.R. § 416.924(c). At Step Three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals, or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1. 20 C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the listings, the Commissioner must assess the functional limitations caused by the impairment by evaluating how a child functions in six domains: (1) acquiring and using information; (2) attending and

completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for [oneself]; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(i)-(vi).  If a child's impairment results in "marked" limitations[1] in two domains, or an "extreme" limitation[2] in one domain, the impairments functionally equal the listings and the child will be found disabled.  20 C.F.R. § 416.926a(d).

## IV. Evidence

### A. School Evidence

On August 24, 2014, Sandra Grabowski, one of K.G.'s teachers, completed a Teacher Questionnaire.  (Tr. 433–36).  Grabowski indicated that K.G. had problems in the "acquiring and using information" domain, including: (1) very serious problems with providing organized oral explanations and adequate descriptions; (2) serious problems with reading and comprehending written material, and expressing ideas in writing; (3) obvious problems with understanding school and content vocabulary, comprehending and doing math problems, understanding and participating in class discussions, and applying problem-solving skills in class discussions; and (4) slight problems in comprehending oral instructions, learning new material, and recalling and applying previously learned material.  (Tr. 433).  Grabowski indicated that K.G. also had problems in the "attending and completing tasks" domain, including: (1) very serious problems with organizing his own things or school materials, and completing work accurately without

---

[1] A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2)(i).  A "marked" limitation is "more than moderate" but "less than extreme."  *Id.*  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean."  *Id.*

[2] An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).  An "extreme" limitation means "more than marked."  *Id.*  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean."  *Id.*

careless mistakes; (2) a serious problem with carrying out multi-step instructions; (3) obvious problems with focusing long enough to finish assigned activities or tasks, refocusing to tasks when necessary, completing class/homework assignments, and working at a reasonable pace/finishing on time; (4) slight problems with paying attention when spoken to directly, sustaining attention during play/sports activities, carrying out single-step instructions, waiting to take turns, and working without distracting himself or others; and (5) no problems with changing from one activity to another without being disruptive. (Tr. 434). Finally, Grabowski indicated that K.G. did not have any problems in the "caring for himself" domain, except that he had a serious problem with knowing when to ask for help and a slight problem with using appropriate coping skills to meet the daily demands of the school environment. (Tr. 435).

On August 28, 2014, Michelle Pham, K.G.'s treating speech and language pathologist ("SLP"), completed a questionnaire. (Tr. 218–19). Pham stated that K.G. received only "consultative services," rather than speech-language therapy. (Tr. 218). She stated that K.G. had 100% intelligibility of speech in all contexts, he had a total language score of 85, his language skills were not likely to have an adverse effect on his education, and his teachers no longer reported audiology problems with his performance. (Tr. 218–19). Pham stated that K.G.'s receptive language issues were likely a result of issues focusing, rather than an ongoing language disorder. (Tr. 218–19).

**B.    Medical Evidence**

From August 2009 through June 2010, K.G. received speech and language therapy from the Achievement Centers for Children. (Tr. 452–81). In an evaluation, dated August 24, 2009, SLP Jennie Grigsby noted that K.G. had a "moderate expressive language delay" and a "significant receptive language delay," which impacted his ability to effectively communicate.

4

(Tr. 454). Grigsby stated that K.G. had a good prognosis for improving with speech-language therapy. (Tr. 454).

On July 19, 2014, K.G. presented to Dr. Deborah Brindze, M.D., for routine health maintenance. (Tr. 366). Dr. Brindze noted that K.G. was in 2nd Grade, did not receive educational accommodations, had appropriate social interaction and normal behavior, and performed at his grade level. (Tr. 366). She noted that K.G. (or his mother) was "concerned about school," wanted to be evaluated for ADHD, and had an individualized education plan. (Tr. 366).

On November 5, 2014, K.G. presented to G. Bradley Gascoigne, M.D., for a behavior consultation. (Tr. 371, 419, 497). Dr. Gascoigne noted that K.G. was struggling in 2nd Grade, and he diagnosed K.G. with ADHD, a language disorder involving understanding and expression of language, a learning disorder involving math, and a "disorder of written expression." (Tr. 371, 373, 497). Dr. Gascoigne prescribed K.G. an ADHD medication. (Tr. 421, 499).

On January 21, 2016, K.G. presented to Dr. Debora Brindza, M.D., for health maintenance. (Tr. 492–95). Dr. Brindza noted that K.G. was in 3rd Grade, and that he had age appropriate social interaction, normal school behavior, and appropriate grade level performance. (Tr. 492). She noted that K.G. was well-adjusted to school, that the school changed his individualized education plan, and that he was doing better. (Tr. 492).

  **C.**  **Opinion Evidence**

    **1.**  **State Agency Consultants**

In September, November, and December 2014, state agency medical consultants Dr. Robert Klinger, M.D., Dr. David Dietz, Ph.D., and SLP Melissa Hall reviewed K.G.'s medical records, and opined that he did not have an impairment or combination of impairments

5

that met, medically equaled, or functionally equaled the listings. (Tr. 92–93). In March 2015, state agency consultants Dr. John Mormol, M.D., Dr. Jennifer Swain, Psy.D., and SLP Mary Jones reviewed K.G.'s medical records and reached the same conclusion. (Tr. 80). The state agency consultants opined that K.G.'s medical records showed that he had "less than marked" limitations in acquiring and using information, attending and completing tasks, moving about and manipulation of objects, caring for himself, and health and physical well-being. (Tr. 78–80, 91–92). Further, they stated that K.G.'s medical records indicated that he had no limitation in interacting and relating with others. (Tr. 79, 91). Hall noted that K.G.'s language was 100% intelligible in all contexts, that his lack of focus contributed to his low receptive communication scores, and that his language skills did not adversely affect his education. (Tr. 91). Jones noted that K.G.'s attention issues had negatively impacted his speech and language development, that his language delays caused less than marked limitations, that his language was 100% intelligible in all contexts, and that his language skills appeared appropriate for conversational interactions. (Tr. 78–79).

## 2. Consultative Examination by Psychologist Dr. Rachel Tangen, Ph.D.

On September 15, 2014, September 16, 2014, September 23, 2014, and October 13, 2014, K.G. presented to neuropsychologist Dr. Rachel Tangen, Ph.D., for psychological consultative examinations. (Tr. 384–91). Dr. Tangen noted that K.G. was in 2nd Grade, that Germany reported that he had trouble with reading and organization, and that K.G. had developmental delays—saying single words at 2 years old and sentences at 3 to 4 years old. (Tr. 384). She noted that K.G. had difficulty with speech and language, that his sentences were unclear and difficult to understand, and that he often used wrong words in his sentences. (Tr. 384). Dr. Tangen noted that a 2010 developmental test indicated that K.G. had poor development in

6

cognition, communication, and social emotional development, and that K.G. qualified for special education services based on his developmental delay, poor language and reading skills, and attention and anxiety problems. (Tr. 385). Dr. Tangen determined that K.G. had a full scale IQ of 76, with a verbal comprehension index of 75, perceptual reasoning index of 82, working memory index of 91, and processing speed index of 80. (Tr. 386, 392). Dr. Tangen performed several language development tests, and determined that K.G. had a broad reading score in the average range (1.8 grade equivalent), a low-average reading fluency and comprehension score, and a low-average brief written language score (1.0 grade equivalent). (Tr. 386, 393). Dr. Tangen stated that K.G.'s receptive language index was in the mildly impaired range, and that he was borderline impaired in sentence comprehension, following directions, identifying word classes, expressive language, formulating sentences, and understanding grammatical word structure. (Tr. 386). Based on K.G.'s language deficits and reported inattention, hyperactivity, and impulsivity, Dr. Tangen diagnosed K.G. with a language disorder, ADHD, and a learning disability in written language. (Tr. 388). Dr. Tangen recommended that K.G. receive speech and language therapy, use online reading practice resources, and receive school interventions to improve his writing skills. (Tr. 388–90).

    **2. Consultative Examination by Psychologist Dr. Deborah Koricke, Ph.D.**

  On October 27, 2014, K.G. presented to Dr. Deborah Koricke, Ph.D., for a psychological consultative examination. (Tr. 405–15). Dr. Koricke noted that K.G.'s speech was 100% intelligible during the examination, and that he was able to respond to questions in an age appropriate manner; however, his attention deficits prevented him from responding appropriately at times. (Tr. 407, 409). Dr. Koricke determined that K.G. had a full scale IQ of 84, with a verbal comprehension index of 85, perceptual reasoning index of 92, working memory index of

80, and processing speed index of 94. (Tr. 411–12). Dr. Koricke determined that K.G.'s IQ scores placed him within the low average range of intellectual ability, and she diagnosed K.G. with ADHD. (Tr. 412). Dr. Koricke noted that K.G.'s speech services through the school had been terminated, and that his language disorder was resolved. (Tr. 412). Dr. Koricke opined that K.G.'s ADHD caused him to have difficulty staying focused and completing tasks, when compared to his typically-developing children of the same age. (Tr. 414).

### D. Relevant Testimonial Evidence

#### 1. K.G.'s Testimony

K.G. testified that he was in the 4th Grade at a preparatory school, and that he did not like school because of all the "fights and . . . talking" that happened in class. (Tr. 41–42). He stated that he liked his previous school better, and that he did not play with the kids at his new school because his mother told him not to. (Tr. 42). He stated that he liked to play video games and football, and he did not have any problems at home. (Tr. 43–44).

#### 2. Germany's Testimony

Germany testified that it was hard for K.G. to pay attention, and that she would have to redirect him to tasks, such as homework, getting dressed, taking care of his personal hygiene, and helping with chores. (Tr. 49–50, 55, 57). K.G. would take "about an hour or two" to do his homework, but he did not always finish it. (Tr. 63). K.G. received speech therapy at school, because he would ramble when he talked and did not always understand people when they spoke to him. (Tr. 52). K.G. read books, and "most of the time" he could tell Germany the main idea of the story he was reading. (Tr. 55–56). K.G. did not have any behavioral problems in school, and his grades were mostly Bs, Cs, and Ds. (Tr. 56). Though he liked playing video games, K.G. would only play for five minutes before he moved on to something else and left the

8

television running. (Tr. 58). Germany stated that the most common complaint she received about K.G. was that he would be off task, unfocused, or unable to stay in his seat at school. (Tr. 60–61, 63–64). Germany stated that, since filing his application, K.G. had gotten worse because he started wetting himself, and that the school was not letting him use the restroom. (Tr. 62).

### 3. Medical Expert's Testimony

Medical expert Dr. Phani Nimmagadda, M.D., testified that K.G.'s medically determinable impairments included "mild to moderate and persistent" asthma, developmental delays, speech and language delays, and ADHD. (Tr. 66). He stated that none of K.G.'s medically determinable impairments met or medically equaled the listings. (Tr. 66). He stated that, at the time of the hearing, K.G. had less than marked impairments in acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for himself, and health and physical well-being. (Tr. 67). He stated that K.G. had improved over time, "but there may be some times when [K.G.'s] domain evaluations, . . . especially, acquiring and using information and attending and completing tasks, could have risen to the level of being marked." (Tr. 67). He stated that "probably from 2014 through 2015" K.G. may have had marked limitations with regard to his communication deficits. (Tr. 68).

## V. The ALJ's Decision

On April 11, 2017, the ALJ issued a decision determining that K.G. was not disabled and denying his application for supplemental security income. (Tr. 15–30). The ALJ noted that, although K.G. alleged an onset date of July 17, 2009, consideration of any period before August 23, 2013, was precluded by an August 22, 2013, final decision denying K.G.'s April 1, 2013,

9

application for supplemental security income. (Tr. 15). The ALJ determined that, since filing his application on July 14, 2014, K.G. had not engaged in substantial gainful activity. (Tr. 18).

At Step Two, the ALJ found that K.G. had severe impairments, including ADHD and mild-to-moderate persistent asthma. (Tr. 18). The ALJ stated that, although K.G. had "a history of speech disorder and learning delays, the records demonstrate[d] that his speech improved with therapy provided through his school, and [he] was discharged from speech therapy services in 2013. (Tr. 18). The ALJ noted that records from K.G.'s SLP indicated that K.G.'s language deficits were more likely the result of his attention issues, and that Dr. Koricke found no evidence of diagnosable learning issues. (Tr. 18). Furthermore, the ALJ noted that K.G.'s treatment records showing that his speech was 100% intelligible, as well as Dr. Nimmagadda's testimony, supported the conclusion that K.G.'s history of speech and language developmental disorders "caused no more than minimal impact on the claimant's age-appropriate functioning." (Tr. 18).

At Step Three, the ALJ determined that K.G. did not have an impairment, or combination of impairments, that met, medically equaled, or functionally equaled the severity of the listings. (Tr. 18–29). The ALJ found that K.G. did not functionally equal the severity of the listings, because, although he had marked limitations in attending and completing tasks, he had less than marked impairments across all other functional domains. (Tr. 19–29). In doing so, the ALJ noted that he considered all of the relevant evidence in the case record, including "all treating, examining, and non-examining medical opinions, as well as opinions from non-medical sources." (Tr. 19, 21). The ALJ stated that he gave great weight to Dr. Nimmagadda's opinion that K.G. had less than marked limitations in all functional areas. (Tr. 21–22). Nonetheless, the ALJ determined that "Dr. Nimmagadda's conjecture that the claimant's impairments may have

been 'marked' in more than one area at a remote point in time [was] . . . unsupported by the weight of evidence." (Tr. 22). Furthermore, the ALJ determined that Grabowski's opinion that K.G. had very serious problems across several functional domains was not supported by narrative explanations or academic records, and was inconsistent with other evidence in the record. (Tr. 22). The ALJ gave great weight to: (1) Dr. Koricke's opinion that K.G.'s ADHD caused some limitation in age appropriate function; (2) the state agency consultants' opinions that K.G.'s impairments caused less than marked limitations in all functional domains; and (3) SLP Pham's opinion that K.G.'s language was age-appropriate and 100% intelligible, and that any deficits were most likely the result of attention issues rather than an ongoing language disorder. (Tr. 21–22). Accordingly, the ALJ determined that K.G. was not disabled from July 14, 2014, through the date of his decision and denied K.G.'s application for supplemental security income. (Tr. 29).

**VI. Law & Analysis**

    **A. Standard of Review**

The court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. §§ 405(g) and 1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rodgers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard of review, a court will not decide the facts anew, make credibility determinations, or re-weigh the evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (providing that, if the Commissioner's findings as to any fact are supported by substantial evidence, those findings

11

are conclusive); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor when testifying."). Even if the court does not agree with the Commissioner's decision, or substantial evidence could support a different result, the court must affirm if the Commissioner's findings are reasonably drawn from the record and supported by substantial evidence. *See Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Though the court's review is deferential, the court will not uphold the Commissioner's decision when the ALJ failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, however, we review decisions of administrative agencies for harmless error. Accordingly, . . . we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (citations and quotation omitted)). Furthermore, the court will

not uphold a decision, even when supported by substantial evidence, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

**B.  Weighing of the Medical Expert's and Teacher's Opinions**

Germany argues that the ALJ erred by failing to adequately explain his reasons for giving little weight to Dr. Nimmagadda's testimony that K.G. had marked communication deficits from 2014 to 2015. ECF Doc. 10, Page ID# 554–55. She asserts that, by dismissing that part of Dr. Nimmagadda's testimony as "conjecture," the ALJ simply "cherry-picked" the parts of the medical expert's testimony he wanted to adopt, while summarily dismissing the rest. *Id.* at 555. The Commissioner responds that the ALJ did not err in giving little weight to Dr. Nimmagadda's testimony that K.G.'s impairments may have been marked at a remote point in time, because the ALJ explained that Dr. Nimmagadda's opinion with respect to that point was speculative and unsupported by the weight of the evidence. Doc. 11, Page ID# 571. Further, the Commissioner asserts that the ALJ's decision to give that part of Dr. Nimmagadda's opinion little weight was supported by substantial evidence. *Id.* at 571–74.

13

In determining whether a claimant is disabled, an ALJ must evaluate the weight to assign to every medical opinion that the Social Security Administration receives.  20 C.F.R. § 416.927(c). Generally, an ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion.  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'"  *Id.*  Instead, an ALJ must weigh such opinions based on: (1) the examining relationship; (2) the degree to which supporting explanations consider pertinent evidence; (3) the opinion's consistency with the record as a whole; (4) the physician's specialization related to the medical issues discussed; and (5) any other factors that tend to support or contradict the medical opinion.  *Id.*; 20 C.F.R. § 416.927(c).  Nonetheless, nothing in the regulations require the ALJ to discuss each of the factors explicitly in his decision.  *See generally* 20 C.F.R. § 416.927.  An ALJ is not required to give "good reasons" for rejecting a nontreating or nonexamining opinion.  *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (declining to address whether an ALJ erred in failing to give good reasons for not accepting non-treating physicians' opinions).

A teacher's opinion is "not [an] acceptable medical source for purposes of establishing an impairment."  *Perry v. Comm'r of Soc. Sec.*, 501 F. App'x 425, 427 (6th Cir. 2012); 20 C.F.R. § 416.913(a).  Nonetheless, an ALJ may consider a teacher's opinion regarding how a child's impairments affect his daily activities and function, so long as the teacher's opinion is consistent with the record.  *Id.*; 20 C.F.R. § 416.924a(c).

The ALJ applied proper legal procedures in weighing Dr. Nimmagadda's and Teacher Grabowski's opinions.  The ALJ was not required to give controlling weight to Dr. Nimmagadda's opinion, because he was not a treating physician, or to Grabowski's opinion,

14

because she was a teacher. *Gayheart*, 710 F.3d at 376; *Perry*, 501 F. App'x at 427; (Tr. 66–68, 433–36). Instead, the ALJ properly assessed the weight due to Dr. Nimmagadda's and Grabowski's opinions by determining whether they were supported by or consistent with the other evidence in the record. *Gayheart*, 710 F.3d at 376; *Perry*, 501 F. App'x at 427; 20 C.F.R. §§ 416.924a(c), 416.927(c); (Tr. 21–22). Furthermore, the ALJ was not required to articulate good reasons for partially rejecting Dr. Nimmagadda's opinion and rejecting Grabowski's opinion. *Smith*, 482 F.3d at 876. Nonetheless, the ALJ adequately explained that Dr. Nimmagadda's opinion was not supported by the weight of evidence in the record and that Grabowski's opinion was inconsistent with the other evidence in the record. *Gayheart*, 710 F.3d at 376; *Perry*, 501 F. App'x at 427; 20 C.F.R. §§ 416.924a(c), 416.927(c); (Tr. 21–22).

Substantial evidence supports the ALJ's decision to reject part of Dr. Nimmagadda's opinion and to reject Grabowski's opinion. Here, the rejected part of Dr. Nimmagadda's opinion and Grabowski's opinion were inconsistent with: (1) treating SLP Pham's 2014 opinion that K.G.'s language was 100% intelligible, that he was not likely to have an adverse effect on his education, and that any language issues were likely the result of inattention, rather than an ongoing language disorder; (2) Dr. Koricke's opinion that K.G.'s speech was 100% intelligible and that he was able to respond to questions in an age appropriate manner; and (3) the state agency consultants' opinions that K.G. had less than marked limitations across all domains. (Tr. 78–80, 91–92, 218–19, 407, 409). Thus, because substantial evidence supports the weight given to Dr. Nimmagadda's and Grabowski's opinions, the ALJ's decision to discount or reject those opinions was within the Commissioner's "zone of choice," and may not be second-guessed by this court. *Mullen*, 800 F.2d at 545; *Jones*, 336 F.3d at 476; *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241.

### C. K.G.'s Speech and Language Developmental Delay

Germany argues that the ALJ erred by failing to adequately explain his finding that K.G.'s speech and language developmental delay was not a severe impairment. ECF Doc. 10, Page ID# 555. She asserts that the ALJ's failure to find that K.G.'s developmental delay was a severe impairment was not harmless error, because it was "part of [a] concentrated effort to make the claimant appear better functioning than he actually is." *Id.* at 556. The Commissioner responds that any error in finding that K.G.'s speech and language developmental delay was harmless, because the ALJ found that K.G. had other severe impairments and considered all of K.G.'s severe and non-severe impairments in his Step Three analysis. ECF Doc. 11, Page ID# 570. Further, the Commissioner contends that substantial evidence supports the ALJ's finding that K.G.'s speech and language developmental delay was not a severe impairment. *Id.* at 567–69. Moreover, the Commissioner asserts that Germany's argument that the ALJ made a "concentrated effort" to show that K.G. was better functioning than he actually was is belied by her failure to produce any evidence that the ALJ was biased. *Id.* at 569–70. Finally, the Commissioner contends that the ALJ properly determined that K.G.'s impairments did not meet or equal the requirements of any listed impairment. *Id.* at 574–75.

At the second step of the sequential analysis, the ALJ considers the medical severity of the claimant's impairments. 20 C.F.R. § 416.924(c). If the ALJ determines that the claimant does not have a severe impairment, or combination of impairments, the regulations direct the ALJ to find that the claimant is not disabled. *Id.* An impairment is severe when it causes more than minimal functional limitations. *Id.* The Step Two analysis is a threshold inquiry, requiring the ALJ to proceed to the next step of the sequential analysis when the claimant has at least one severe impairment or combination of impairments. *Bokisa v. Comm'r of Soc. Sec.*,

16

No. 1:16-cv-83, 2017 U.S. Dist. LEXIS 16313 at *19 (N.D. Ohio Jan. 18, 2017); *see also* 20 C.F.R. §§ 416.923, 416.924(c). If an ALJ considers all a claimant's impairments – severe and non-severe – in the remaining steps of the disability determination, then any failure to find additional severe impairments is harmless error. *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

At Step Three of the sequential analysis, the claimant must prove that his impairments meet or medically equal a listed impairment. 20 C.F.R. § 416.924(d). If a child claimant's impairments meet or medically equal a listed impairment, then he is conclusively presumed disabled. 20 C.F.R. § 416.924(d)(1). If not, then he will be found not disabled. 20 C.F.R. § 416.924(d)(2). It is insufficient for a claimant to show that his impairment meets only some of the criteria for a listed impairment, or that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment. *Sullivan v. Zebley*, 493 U.S. 521, 530–31 (1990).

A child's disability is considered to functionally equal the listings when he has a marked limitation in at least two out of six domains of functioning, or an extreme limitation in just one. 20 C.F.R. § 416.926a(a); *Elam*, 348 F.3d at 127. The six domains include: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). A "marked" limitation is "more than moderate" and "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(a), (e)(2).

17

Even assuming that the ALJ erred in determining that K.G.'s speech and language developmental delay was not a severe impairment, any such error was harmless because the ALJ determined that K.G. had other severe impairments and proceeded to consider all of K.G.'s impairments, including his speech and language deficits, at Step Three of the sequential analysis. *Nejat*, 359 F. App'x at 577; *Bokisa*, 2017 U.S. Dist. LEXIS at *19; 20 C.F.R. §§ 416.923, 416.924(c); (Tr. 18–29).  Nonetheless, the ALJ applied proper legal procedures and reached a decision supported by substantial evidence in determining that K.G.'s speech and language developmental delay did not cause a severe impairment.  Here, the ALJ properly considered whether K.G.'s speech and language developmental delay caused him more than minimal functional limitations.  20 C.F.R. § 416.924(c); (Tr. 18).  Furthermore, substantial evidence supported the ALJ's decision that they did not cause more than minimal functional limitations, as evidence in the record showed that K.G.'s speech was 100% intelligible, his school and treating SLP considered his language disorder resolved, his language deficits did not adversely affect his education, and he was able to respond to questions in an age appropriate manner.  (Tr. 78–79, 91, 218–19, 407, 409, 412).  Thus, the ALJ's finding that K.G.'s speech and language developmental delay did not cause a severe limitation was within the Commissioner's zone of choice and should not be disturbed.  *Mullen*, 800 F.2d at 545; *Jones*, 336 F.3d at 476; *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241.

Moreover, the ALJ applied proper legal procedures and reached a conclusion supported by substantial evidence in determining that the combined effect of K.G.'s impairments, including his speech and language deficits, did not functionally equal the listings.  Here, the ALJ properly relied upon the opinions of treating SLP Pham, Dr. Koricke, and the state agency consultants in determining that K.G. did not have marked limitations in at least two functional domains, or

18

extreme limitations in one. *Elam*, 348 F.3d at 127; 20 C.F.R. § 416.926a(a); (Tr. 18–29). Furthermore, substantial evidence supports the conclusion that K.G.'s speech and language developmental delay did not cause marked, much less extreme, limitations in any of K.G.'s functional domains, as evidence in the record shows that he was able to speak with 100% intelligibility and his deficits did not impact his education or ability to communicate in an age appropriate way. 20 C.F.R. § 416.926a(a), (e)(2); (Tr. 78–79, 91, 218–19, 407, 409, 412).

### VII. Recommendation

Because the ALJ applied proper legal procedures and reached a decision supported by substantial evidence, I recommend that the final decision of the Commissioner be AFFIRMED.

Dated: November 6, 2018

Thomas M. Parker
United States Magistrate Judge

---

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).